1                   UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF INDIANA
2                    INDIANAPOLIS DIVISION

3

4  UNITED STATES OF AMERICA,     )
                         )
5           Plaintiff,   ) CAUSE NO.:
                         ) 1:10 –CR–103–01–SEB/KPF
6                       ) Indianapolis, Indiana
        –v–            ) **September 18th, 2012**
7                       ) 10:00 a.m.
  KAMAL TIWARI,            )
8                       )
           Defendant.   )
9                **Before the Honorable**
10           **SARAH EVANS BARKER, JUDGE**

11

12           OFFICIAL REPORTER'S TRANSCRIPT OF
                     SENTENCING
13

14  **For Government:**      Winfield Ong, Esq.
                    Bradley P. Shepard, Esq.
15                 Assistant U.S. Attorney
                    United States Attorney's Office
16                 10 West Market Street
                    Suite 2100
17                 Indianapolis, IN  46204

18  **For Defendant:**       William E. Marsh, Esq.
                    Michael J. Donahoe, Esq.
19                 Indiana Federal Community Defenders
                    111 Monument Circle
20                 Suite 752
                    Indianapolis, Indiana  46204–3048
21
  Court Reporter:       Laura Howie–Walters, FCRR, CSR, RPR
22                 Official Court Reporter
                    United States District Court
23                 46 E. Ohio Street
                    Room 217
24                 Indianapolis, Indiana  46204

25         PROCEEDINGS TAKEN BY MACHINE SHORTHAND
  TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER–AIDED TRANSCRIPTION

1                    (Open court.)

2          THE COURT:  Good morning, all.  You may be seated.

3          Miss Schneeman, will you call the matter before the

4     Court please.

5                    (Call to order of the Court)

6          THE COURT:  All right.  This matter's on the Court's

7     calendar for a sentencing hearing today.  Dr. Tiwari entered

8     his plea of guilty to two counts back on March 9th, 2012:

9     Counts 2 and Count 3, Count 2 being the offense of healthcare

10    fraud resulting in serious bodily injury, and Count 3 being

11    the illegal drug distribution charge.

12         At the conclusion of that proceeding, the Court

13    accepted Dr. Tiwari's plea of guilty, and we adjourned that

14    hearing to allow a presentence report to be prepared and

15    circulated for all to review.

16         That report now has been generated by our probation

17    department and sent around for all to review and to be

18    prepared to address today at this hearing.  So the stage is

19    set for the sentencing hearing that is to ensue this morning.

20         I assume that's everybody else's understanding as to

21    why we're here.  Is that right Mr. Marsh?

22         MR. MARSH:  That's correct, Your Honor.

23         THE COURT:  And Mr. Ong?

24         MR. ONG:  Yes, Your Honor.

25         THE COURT:  So Mr. Marsh, would you escort

1   Dr. Tiwari to the podium, please.

2            Good morning sir.

3            THE DEFENDANT:  Good morning, Your Honor.

4            THE COURT:  Let me ask a few preliminary questions

5   to make sure that the record is complete, although I remember

6   you, of course, from your March appearance.  You are Kamal

7   Tiwari, the same person who was named by the Clerk when she

8   just called this matter; is that true?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  What is your age now, sir?

11           THE DEFENDANT:  I'm going to be 61 on December 23rd,

12  so I'm 60.

13           THE COURT:  I know you can read and write the

14  English language.  Prior to coming to court today, have you

15  consumed any substance, alcohol, medicine or narcotic --

16           THE DEFENDANT:  No.

17           THE COURT:  -- that would interfere with your

18  ability to understand and participate in this hearing?

19           THE DEFENDANT:  No, Your Honor.

20           THE COURT:  Are you yourself under the care of any

21  physician or any other caregiver for something that might

22  interfere with your ability to understand and participate?

23           THE DEFENDANT:  No, Your Honor.

24           THE COURT:  As I said just a minute ago, we

25  authorized the probation department to prepare a Presentence

1  Investigation Report after our prior hearing.  Ms. Ivie drew

2  that assignment.  Do you recognize Ms. Ivie over here?

3          THE DEFENDANT:  Yes, I do.  Hi.

4          THE COURT:  And she's prepared a report and sent it

5  around for all to review.  So let me just start there.  Did

6  you get a chance to read the report that she prepared?

7          THE DEFENDANT:  Yes, I did.

8          THE COURT:  And did you have sufficient time to

9  familiarize yourself with everything that's in the report and

10  also discuss it with your lawyers?

11          THE DEFENDANT:  Yes, I did, Your Honor.

12          THE COURT:  Mr. Marsh, Mr. Donahoe, have you had

13  sufficient time to review the report and prepare for the

14  hearing today?

15          MR. MARSH:  We have, Judge.

16          THE COURT:  Mr. Ong and your colleagues, have you

17  had sufficient time to review the report and prepare?

18          MR. ONG:  Yes, Your Honor.

19          THE COURT:  When you read through the report,

20  Dr. Tiwari, you probably noticed that it has two kinds of

21  information, generally speaking.  One part of the report has

22  to do with you in a personal or biographical sense.  So it

23  lays out in summary fashion a variety of biographical facts,

24  things like your education, your family, your health, your

25  work history and so forth.

1          The other part of the report has to do with these

2     offenses that you've been found guilty of, and how the

3     sentencing guidelines apply to define the possible range for a

4     sentencing when we get to that part of our hearing today.

5          Did you notice that the report has those two kinds

6     of information?

7               THE DEFENDANT:  Yes, I did, Your Honor.

8               THE COURT:  This is a document that's tailor-made to

9     you, and it's prepared for the purposes we're using it for

10    today.  It's a document we keep under seal in our court's

11    records, which means it's kept in a confidential status, so

12    you don't need to worry about it getting out in some way that

13    would embarrass you or compromise your family's security.

14    It's confidential.

15          There are a few other official uses that can be made

16    of the report by the Bureau of Prisons and by the courts and

17    the probation department, but generally, it's limited in those

18    ways.  Do you understand that, sir?

19              THE DEFENDANT:  Yes, Your Honor.

20              THE COURT:  Besides the report itself, and the other

21    filings that have been made with the court, the defendant's

22    sentencing memorandum in particular, I have received, I was

23    going to say a series of letters, but I would have to say a

24    volume of letters from family and friends and patients and

25    colleagues and so forth, all of which I have reviewed in

1 preparation for today's hearing.  These are all letters that

2 you've had access to as well and the lawyers.  So you know

3 everything that I know of a factual nature on the basis of

4 which I'll make a sentencing decision today.  Nothing's been

5 withheld from you.

6         Do you understand that?

7         THE DEFENDANT:  Yes, I do.

8         THE COURT:  Now, Ms. Ivie, because she's required to

9 do this, has complied with our local rules of court and has

10 provided me with a memo that's confidential between the

11 probation officer assigned to the task of preparing the report

12 and the judge who has the sentencing responsibility.  That

13 memo doesn't contain any new facts.  Everything in that memo

14 relates to the Presentence Investigation Report which you've

15 seen.

16         In any event, her memo to me is not disclosed to

17 anyone else.  As I say, there's no prejudice to you from that,

18 but I nonetheless give you notice of that.  All right, sir?

19         THE DEFENDANT:  Thank you.

20         THE COURT:  So I received one letter this morning.

21 I just want to make sure that this one was received or you had

22 access to it as well.  Do you want to come up here, Mr. Marsh?

23 Because it was late in arriving at my desk, I just want to

24 make sure you've seen that one, too.

25         MR. MARSH:  I don't think we have seen this one,

1  Judge.  Could we have just a minute to review it?

2         THE COURT:  Take a minute to review it.  I want it

3  to be true that you know everything that I know.

4                    (Off-the-record discussion.)

5         Would you hand that back to Mr. Ong so he can see it

6  as well?

7         Thank you.  Let me just inquire, Mr. Ong, have you

8  and your colleagues had an opportunity to review the letters

9  that have been submitted to the Court?

10        MR. ONG:  Yes, Your Honor.

11        THE COURT:  Let me tell you, Dr. Tiwari, although

12  I'm confident your lawyers have explained this, I just need to

13  make sure.  The point at which we're headed this morning at

14  this hearing is for me to have a sufficient understanding of

15  this case, the facts surrounding these offenses, and your

16  history and characteristics and so forth, all the surrounding

17  factors so that in the final determinations that must be made,

18  I'm able to impose a reasonable sentence.

19        Now, you can hear by the way I said that that I sort

20  of stressed that word "reasonable."  That's because in this

21  context, that is a word of art.  It has a special meaning.  It

22  doesn't mean reasonable just as I may think it's appropriate.

23  It doesn't mean reasonable even if we took a little survey

24  around this room or around the Southern District of Indiana.

25        It means reasonable under law, and the law lays out

1   the criteria for a reasonable sentence.  And it's my

2   obligation to listen, and to take into account the factors

3   that are set out in the law and fold those into my sentencing

4   decision.

5          To the extent that I succeed in doing that, it will

6   be deemed a legally reasonable sentence.  Now, we use the

7   sentencing guideline determination that's laid out in the

8   presentence report to inform that judgment.  We'll also use

9   the elements of your plea agreement to inform that judgment.

10          But in the final analysis, even after we do the

11   sentencing guideline determination and look again at the plea

12   agreement, the decision that has to be made is mine to make,

13   and it is to impose a reasonable sentence.

14          Now, you've reached an agreement under a rule that

15   the lawyers and I refer to as an 11(c)(1)(c) agreement.

16   That's a special breed of plea agreement because it means that

17   you and the Government have reached an agreement between

18   yourselves that the sentence that's imposed be consistent with

19   your agreement.  And if at the conclusion of this hearing that

20   doesn't seem reasonable to me, it's not appropriate as I

21   assess those statutory factors, then I'll reject your plea

22   agreement.  But if it seems reasonable to me, all things

23   considered, I'll impose a sentence that conforms to your

24   agreement.

25          One of the things I'll be thinking about to take

1  into consideration and that I will take into account in making

2  that decision is the guideline determination and these 3553(a)

3  factors that are laid out by the statute.

4          So that's the process that we're going to follow

5  today.  Is what I've told you, Dr. Tiwari, what your lawyers

6  have told you in preparing you for today?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  So when the presentence report was

9  circulated, according to the addendum, neither side had any

10 objections to the way in which Ms. Ivie has interpreted and

11 applied the guidelines.  Is that your view, Mr. Marsh?

12         MR. MARSH:  It is, Your Honor.

13         THE COURT:  Mr. Ong, is that your view as well, sir?

14         MR. ONG:  Yes, Your Honor.

15         THE COURT:  The upshot of the Presentence

16 Investigation Report's approach to the sentencing guidelines

17 is as follows:  The total offense level is 26 and the criminal

18 history category is one.

19         Now, do you remember how we got to those numbers,

20 Dr. Tiwari?

21         THE DEFENDANT:  Yes, I do, Your Honor.

22         THE COURT:  And having determined those numbers

23 under the sentencing guidelines, we -- I'm just going to show

24 you the sentencing table here to refresh your memory -- we go

25 to that (indicating), down to the left margin here for an

1    offense level 26, and the first category is 63 to 78 months as

2    the period of incarceration under the guidelines.

3            Do you remember that and how we got there?

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  So let me state officially that my own

6    judgment is that the presentence report is a correct

7    interpretation and application of the guidelines, and so I

8    adopt this format that's laid out in the report, and we use it

9    for the purposes that ensue.

10           Now, I did want to bring your attention to one thing

11   just so that you recall.  In paragraph 114, do you have it

12   there, Mr. Marsh?  It's right at the end of the presentence

13   report.

14           MR. MARSH:  Yes, Your Honor.

15           THE COURT:  Those are the statutory factors,

16   Dr. Tiwari, that I was referring to.  Ms. Ivie has helpfully

17   lifted those from the statute, and put them into the report so

18   that all will know that those are the factors that will be

19   guiding my discretion in making a sentencing decision today.

20           Do you remember reading those before, sir?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  I just want you to see them again so you

23   know what it is I was referring to.

24           Now, the guidelines as they apply to your case are

25   as follows.  These are laid out in the presentence report so

1  I'm summarizing that report.

2  The period of incarceration for an offense under

3  these guidelines is 63 months on the low end up to 78 months

4  on the high end.

5  You would not be eligible for probation under the

6  guidelines. The supervised release term on Count 2 is one to

7  three years, and on Count 3, it's three years. Do you

8  remember what supervised release is?

9  THE DEFENDANT: Yes, Your Honor.

10  THE COURT: The fine range is $12,500 on the low end

11  up to a million dollars on the high end.

12  Restitution, which means paying back the victims of

13  this offense, the total amount has been calculated and to

14  which no one has interposed an objection, is $1,299,886.54.

15  And restitution will be mandatory, so that's likely to be part

16  of any judgment that's imposed.

17  There is a special assessment of $200, which is

18  calculated at the rate of a hundred dollars per felony

19  conviction. That's a fee payable to the Clerk. It also is

20  mandatory and needs to be paid forthwith. So that will be

21  part of any judgment that's imposed as well.

22  Mr. Marsh, can that be paid today?

23  MR. MARSH: The $200, can you pay that today?

24  THE DEFENDANT: Possibly. My wife may have it.

25  THE COURT: Counsel, will you stick with it long

1    enough to try to get that payment made to the Clerk?

2              MR. MARSH:  We will, Your Honor.

3              THE COURT:  So, Mr. Marsh, do you agree with that

4    extrapolation of the guidelines?

5              MR. MARSH:  Yes, Your Honor.

6              THE COURT:  Mr. Ong, do you also agree with that

7    extrapolation?

8              MR. ONG:  Yes, Your Honor.

9              THE COURT:  So that's the beginning point for the

10   Court's decision making.  I want to restate the terms of your

11   11(c)(1)(c) agreement because my discretion with respect to

12   that plea agreement is either a yes or a no, a thumbs up or a

13   thumb's down.

14             So here's the agreement that you've reached as I

15   understand it, that in terms of the period of incarceration,

16   you've agreed with the Government that the term should be any

17   amount up to 78 months.  So the sentence is capped at 78

18   months, which is the high end of the guidelines as well.  And

19   that would be a sentence to run on each count concurrently.

20             The period of supervised release under the agreement

21   is three years.  The Government will dismiss the remaining

22   counts in this indictment against you as part of the plea

23   agreement, that there be no fine in light of the restitution

24   figure which is mandatory.  And if I accept your plea

25   agreement and sentence you in accordance with that plea, that

1   you're giving up your right to appeal the sentencing decision.

2          I've summarized your plea agreement as I understand

3   it.  Is that how you understand it as well, Dr. Tiwari?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Mr. Marsh, have I summarized it

6   accurately?

7          MR. MARSH:  Yes, you have, Your Honor.

8          THE COURT:  Is it your judgment as well, Mr. Ong,

9   that my summary is accurate?

10         MR. ONG:  Yes, Your Honor.

11         THE COURT:  So that's where things stand,

12  Dr. Tiwari.  And it's appropriate for you to speak and to tell

13  me whatever it is you want me to know and think about and take

14  into account.  Once the sentence is imposed today, it's

15  unlikely that there will be another opportunity for the Court

16  to consider it.  There's not such a thing as a motion to

17  reconsider a sentence.  Sometimes if there's an appeal, a case

18  will come back, but that doesn't happen often enough that you

19  should count on that.

20         So don't put off till another day whatever it is you

21  think you'd like to bring to my attention today assuming that

22  there will be another day, because I'm indicating to you now

23  that there's not likely to be.

24         After I hear from you, sir, I'll hear from your

25  lawyers on your behalf, and I'll hear from the Government

1    lawyers.  Then I'll impose a sentence.  So you may lead off,

2    Dr. Tiwari.

3              THE DEFENDANT:  Honorable Judge, respected members

4    of the defense and prosecution team, good morning.  These are

5    some of the most difficult words I may utter in my life.

6    However, they are straight from my heart, and they are

7    reflective of the truth.

8              First, I acknowledge that I have pleaded

9    11(c)(1)(c).  I sincerely, without any pretense, take full

10   responsibility.  I'm deeply remorseful with a sincere sense of

11   wrongdoing.

12             My sentiments, first and foremost, are from my

13   patients.  I feel their pain.  I feel their suffering that

14   resulted from my treatment for their chronic pain.

15             I also feel and realize the morbidities and the

16   mortalities associated with the consequences of my treatment

17   for their chronic pain and chronic disease.

18             Nothing would bring me more peace than the prospect

19   of reversing the consequences, the consequent scourge of

20   drug-related abuse and loss due to my treatment.  My heart

21   goes out to the patients facing pain, lots of inability to

22   work and their ultimate indignity from everybody in the

23   society.

24             I wish I could change the past.  However, we know I

25   cannot do that.  In my remaining days in my life, every life I

1    might save from drug addiction will ease the guilt and the

2    pain that I feel for the whole situation.

3              Your Honor, I'm not proud of this moment in my life.

4    Actually, I'm quite ashamed.  Your Honor, for most of my life,

5    as it has progressed, I've always been very proud of what I've

6    done.  It's very hard -- I'm sorry --

7              I've worked very hard to attain the dignity of

8    practicing physicians.  As you know, Your Honor, I'm an

9    Indian-immigrant American.  I came here in 1973.  I had some

10   of the best education in the world, and actually was a top of

11   the departments through school.

12             I came here born of Hindu parents, sponsored by a

13   Jewish family, baptized in the Lutheran church, married in

14   Lutheran church.  I married a girl whose father was a Brith

15   Air Force engineer, whose mother was a Berliner, a German.  We

16   have five beautiful kids, and I go to an evangelical church in

17   Bloomington, Indiana, the last two years.

18             I have always done utmost at anything I've done.

19   When it came to schooling, I did the most.  When it came to

20   certifications, I did the most.  When it came to building

21   clinics and hospitals, I would do the most.

22             To do things in the most efficient fashion, to have

23   an idea and to make it happen, has been my trait.  I did that

24   every aspect of my life.

25             Practicing pain management was not necessarily my

1  choice.  Circumstances in Bloomington were such that I was not

2  allowed to practice in only one hospital that existed.  Pain

3  management was my second choice.  I will tell you that,

4  irrespective of whatever judgment and whatever future, I will

5  never practice pain management.

6      There are issues, but I've accomplished a lot of

7  things in my life.  I've had recent submissions.  I have had

8  charities.  I've never wanted to be second when it came to

9  giving, and always, always available to my patients.  My

10  results weren't always perfect.  I would -- I believe God has

11  given me gifts.  I believe and -- I believe and I hope I'm not

12  done applying myself for the things I can do for my patients,

13  for my family, for my community, for my nation, and things

14  even at large in the world.

15      That's the view I have of the world.  I feel there's

16  a lot that I would do.  I feel urge and desire to be out there

17  and apply myself again.  I have to tell you, I'm totally sorry

18  for putting everybody through this, not just my patients, the

19  system, my family, everybody concerned.

20      And, of course, I beg for leniency and the utmost

21  compassion from you.  You have the power to do what you have

22  to do.  And I just hope and pray that the consequence of all

23  this will result in more positive outcome for everybody,

24  including patients, patients to be, family, families to be,

25  community, nation.

1        I will promise you I will dedicate myself.  I have

2   learned a lot in the last five years, especially in the last

3   two, what to do and what not to do.  So as I take full

4   responsibility, I also hope and pray that a greater good may

5   come, depending on your decision, for my faculties, for my

6   passion, for my abilities, to be used in a fashion that may

7   help save more lives than I may have adversely affected.  And

8   I just beg you to give me that chance.  That's all, Your

9   Honor.

10       THE COURT:  Thank you, Dr. Tiwari.  The statement

11  that you've made was, I know, just as you said it was, one of

12  the most difficult things you've ever had to do.  It requires

13  you to take stock of behaviors that you engaged in that were

14  not reflective of your own expectations for yourself, never

15  mind the communities and your patients and so forth, that for

16  whatever reasons during the period of time covered by this

17  indictment, you fell beneath your own expectations, your own

18  standard of practice.  And that in the process of doing that,

19  you created great harm.  You harmed patients that I know on

20  the one hand you would never believe that you would have

21  harmed since that was inimical to your own sense of

22  responsibility, your own oath as a physician, your own duties,

23  your training, et cetera.

24       You cut corners with respect to the kinds of care

25  you were giving, and the ways in which that it was being paid

1 for so that the programs that the federal government has in

2 place to finance those treatments were exploited by you.  This

3 amount of restitution, basically $1.3 million, didn't just

4 happen as a result of a couple of times of violations.  This

5 is a substantial amount of money.

6          Now that said, no one should ignore, no one could

7 reasonably ignore, the positive impact, the things you've done

8 that have been very good in your family and your community,

9 your extended family, your family in India, the way in which

10 you've taken in people to live with you so that they could

11 have the benefit of an education, often that you paid for, the

12 ways in which you expanded the healthcare options in Monroe

13 County, almost single-handedly.

14          I understand your account for why that became

15 necessary, at least desirable, but I think it was reflective

16 of the way you lived your life all along.  Whenever you found

17 a door that was closed, you found another one to open.  And by

18 and large, it was so that you could do good things.

19          But it's the "by and large" problem that has come

20 back to haunt you, because by and large for a physician isn't

21 enough.  For a physician, it has to be in accordance with the

22 highest standards of your profession, which means every time,

23 every patient, every circumstance.  And I say that without

24 wanting to give the impression that anybody holds you to a

25 standard of infallibility.  You're not here today, Dr. Tiwari,

1  because you made mistakes.  You may have made mistakes in

2  departing from the path that you knew you should have been on.

3  So they were strategic mistakes, but you're here because you

4  did things intentionally.  You violated the law intentionally.

5          It's that intentionality that makes it criminal, and

6  results in these serious charges having been brought and your

7  having to stand now accountable for the consequences of those

8  choices.

9          So in a sense, when I was preparing for this hearing

10  today, it occurred to me that you are a little bit of a Robin

11  Hood figure.  Do you know that story?  Do you know the Robin

12  Hood story?

13          THE DEFENDANT:  Yes.

14          THE COURT:  I bet there's one in Indian literature

15  because I bet it's true of every culture --

16          THE DEFENDANT:  Yes, there is one.

17          THE COURT:  -- where you steal from the rich to give

18  to the poor.  And in your case, you were taking funds that you

19  weren't entitled to -- that's one of the offenses here -- in

20  order to do a lot of good things with the money, all your

21  charitable outlets, all your educational outlets, all the

22  wonderful ways in which you financed and empowered your

23  extraordinary children into the impressive achievements and

24  the lives that they're living now.

25          So in a way, it was cheap charity because you were

1  taking money that you were not entitled to, as the restitution

2  figure says, and I'll remind you, $1.3 million you weren't

3  entitled to, in order to do some other very good things.  I

4  know you didn't -- I read what you wrote -- you didn't spend

5  it on a luxury car or a big house and that sort of thing, but

6  you were spending it in other ways that, while they did good

7  in the community, they also fed your ego because people

8  recognized you as being special and being an important part of

9  the community.

10        We need people to be involved in the community and

11 to make a difference in these ways.  But you have to do it

12 within the law, and you have to do it in an honest and noble

13 fashion if you want the praise that you're entitled to after

14 that.

15        So in all the years I've been the judge of this

16 court, I must say I've never met anyone who was all bad.  And

17 so there's much to be said about you, Dr. Tiwari, that's not

18 only good, but very, very good, but you had a serious lapse

19 here for this year, in 2007 I think it was, at least that's

20 the period of the prosecution, when you lost your compass.

21 You lost your bearings.  And you started practicing -- maybe

22 it was a little bit before that.  These things hardly ever

23 just start on one day and end on another, but at least for the

24 purposes of the Court's review, it's that year that we're

25 examining.  And you stopped holding yourself to your own high

1   standards.  And so for you to say that and to admit that is

2   difficult, but it's hard for all your friends and your family

3   to say that about you because they all have their own good

4   reasons to not want to believe that that's what happened.

5          Some of it is professional admiration, and some of

6   it is love and affection.  Some of it is their own pride that

7   this could have been going on and they wouldn't know about it.

8   Some of the letters I received reflect outpourings of

9   employees, fellow employees' own guilt for not having figured

10  out a way to stop this, and to redirect it, and to get your

11  attention, and to help stop the patterns that have culminated

12  today in this prosecution.

13         So the fact is that you were lots of things to lots

14  of people.  And many of the things that you were in that

15  community and in your profession, and to your neighbors and

16  the schools and so forth, were wonderful things.  They were

17  things that we would want all our citizens to aspire to.  But

18  at the same time, there was this undercurrent where you were a

19  different person, where your patience with your patients was

20  not always in evidence, and when you were trying to run too

21  many people through the day-to-day practice, and where people

22  were presenting signs that the treatment protocols you had

23  prescribed were injurious to them and you didn't back off.

24         I'm not sitting here as a judge in a malpractice

25  case, so I don't know if there was medical malpractice.  I'm

22

1   not equipped to make that decision.  That's not mine to make.

2   I mention it because it's reflective of the lapses that you

3   permitted yourself, if it was true.

4           So, Mr. Marsh, what would you say on Dr. Tiwari's

5   behalf?

6           MR. MARSH:  Thank you, Your Honor.  Judge, I would

7   like to begin by emphasizing for the Court the structure of

8   3553, which I've done in the sentencing memorandum.

9           THE COURT:  Yes, and you know that I've reviewed

10  that.

11          MR. MARSH:  I know that you have, but to emphasize

12  what I think is the main point that I would like to make,

13  which is that 3553 does not say, as this paragraph 114 sort of

14  suggests, that there are all these factors that you take into

15  account and come up with a reasonable sentence as you've put

16  it.  And that's an accurate way to put it, but it's not an

17  amalgam of all these factors.

18          Unfortunately, it's probably become somewhat routine

19  for defense lawyers to say back to you the phrase "sufficient

20  but not greater than necessary" without really emphasizing the

21  significance of that phrase, because that phrase in 3553(a)

22  says the Court shall impose, "shall impose," a sentence which

23  is sufficient but not greater than necessary to serve the

24  purposes of punishment.  The 3553(a)(2) factors state, in the

25  words of Congress, the purposes of punishment, which are

1   incapacitation, deterrence, retribution and rehabilitation.

2   And then the Court says -- I'm sorry, the statute says that in

3   addition to that, the Court shall consider all of these other

4   factors which are listed in paragraph 114, including the

5   sentencing guidelines.

6        But the guiding principle of that is that the

7   punishment should be no greater than necessary to serve the

8   purposes of punishment.  The whole concept of the Sentencing

9   Reform Act is that the Court should not be imposing punishment

10  that doesn't serve some purpose.  And the thrust of the

11  sentencing memorandum, I suggest to the Court, is a position

12  you've probably heard me say before, but I think is more true

13  in this case than any I probably have seen, and that is I can

14  understand the position which I anticipate the Government will

15  take, that a term of incarceration is necessary.  But it's

16  necessary I suggest to you to serve only the purpose of just

17  punishment.

18       Incarceration cannot be justified as a basis for

19  deterrence.  In the sentencing memorandum, I talk about the

20  harm to Dr. Tiwari, to his family, to his practice.  He's lost

21  his license.  He's lost, as you emphasized very well, his

22  respect in the community to a large part.  And so deterrence

23  certainly doesn't justify keeping him in prison for any

24  lengthy period of time.  It's certainly not justified by

25  incapacitation, which of course is necessary in some of the

1    sentences you impose.

2          Dr. Tiwari has been on pretrial release for the past

3    two years approximately, and has not presented any danger to

4    the community.  He doesn't today.  He won't in the future.

5          The probability is that his medical license is going

6    to be permanently taken away from him.  Right now, it's

7    temporarily suspended.  He has another hearing scheduled at

8    the end of this month.  I would submit that it's highly

9    unlikely he will get back the DEA permit to prescribe narcotic

10   drugs.  So it certainly is not necessary to keep him in prison

11   to keep him from committing additional harm.  And obviously

12   there's nothing the Bureau of Prisons can provide in the way

13   of rehabilitation.

14         So all that leads, Your Honor, I suggest to the

15   Court, to the conclusion that if the Court thinks it's

16   necessary to impose a term of incarceration, it should be a

17   short term of incarceration, which would send the message to

18   the community, to fellow physicians, to everyone, that

19   Dr. Tiwari has committed a serious crime, which he has

20   admitted to the Court that he has done, and for the serious

21   crime he's going to go to prison.  But how long he stays in

22   prison is irrelevant to any of those purposes of punishment

23   and serves no purpose.

24         The one thing I want to add, Judge, to what was in

25   the sentencing memorandum is something that came to my

1  attention just last week, which is a report from the

2  Government Accountability Office called "Growing inmate

3  crowding negatively affects inmates, staff and

4  infrastructure."  It's a report to Congressional requesters is

5  the way it's labeled from the Government Accountability

6  Office, and this report states that the Bureau of Prisons

7  facilities currently are 36 percent overcrowded, projected to

8  be 45 percent overcrowded by 2018, which would be the time

9  Dr. Tiwari would likely be in prison if the Court imposed the

10  maximum sentence.

11         This report does not make recommendations but

12  suggests that one way to minimize this harmful effect from

13  overcrowding on, as the report puts it, inmates, staff and the

14  infrastructure, one way to minimize that is alternatives to

15  incarceration.  And Dr. Tiwari presents again an unusual case

16  for an alternative to incarceration, can serve as punishment,

17  can benefit the community, and not adversely impact the

18  overcrowding in the Bureau of Prisons.

19         As you've already described, better than I could, he

20  has many talents.  He still has those talents.  He has many

21  good traits, has many good motivations.  The need in the

22  community for the kind of things that Dr. Tiwari could do as a

23  community service component of supervised release is unusual

24  and unique in the cases that you hear, I suggest.  So that's

25  my petition to the Court.  Dr. Tiwari is --

1          THE COURT:  What are you suggesting he could do

2   other than practice medicine, which he can't do?

3          MR. MARSH:  Well, he suggested in his statement that

4   one thing he could do is counsel people who are addicted to

5   drugs without providing any medical advice or medical

6   treatment.

7          He certainly understands the problems of addiction,

8   the difficulties of addiction, the difficulties of treating

9   pain with additional narcotics.  And so he could -- there are

10  many contexts in which he could provide counseling.  People

11  counsel about alternatives to medication as a way of dealing

12  with drug addiction.

13         It's just maybe the most prominent example that I

14  could think of, and I would suggest that the Court include a

15  community service requirement which could be worked out by

16  probation.  Probation officers deal with a lot of people who

17  are addicted to drugs.  They may work out a program for him

18  where he could even work with the probation office.  There

19  again, the point is there are many things that he could do.

20         As he alluded to, he has suffered greatly.  I can

21  personally attest that over the past year and a half or so

22  that Mr. Donahoe and I have worked with him, he has changed

23  his attitude 180 degrees in terms of dealing with pain and

24  with what is appropriate for the pain medication, and how

25  addicts should deal with the problems that they confront.  And

1    I suggest to the Court that he has a great deal to offer in

2    that field which has nothing do with practicing medicine.

3              THE COURT:  Thank you, Mr. Marsh.

4              MR. MARSH:  Thank you, Your Honor.

5              THE COURT:  Mr. Ong, what's the Government's view?

6              MR. ONG:  Thank you, Your Honor.  Because of the

7    sort of complicated factual nature of this case, and

8    especially because of the lengthy factual record that's part

9    of the sentencing here, I'd like to take a little more time

10   than usual to address some of the things that are in the

11   record.

12             First, Dr. Tiwari received a large number of letters

13   on his behalf, and painted, as the Court has already

14   acknowledged, a complex picture of Dr. Tiwari, certainly a lot

15   of admirable attributes.  But I think it's extremely important

16   to recognize and reject any inference that Dr. Tiwari's not

17   guilty of the crimes here.  He's admitted repeatedly that he

18   has committed the crimes he is charged with and pled guilty

19   to.  It's extremely important, I think, for the community to

20   know, and to the extent that it's important to the Court, as a

21   result of those letters, to know that the Government spent

22   probably three years investigating this case, not because it

23   was dragging its feet, but because it was a set of interesting

24   and complicated facts.

25             The Government was tireless and intent on getting to

1  the truth, interviewed hundreds of people, literally, and that

2  this case did not come to the Government's attention in any

3  way, shape or form by anybody that had an axe to grind with

4  Dr. Tiwari.  We knew nothing about the disputes that he'd had

5  with some in the local Bloomington community until well into

6  the case.  We studiously avoided getting into that.  We did

7  not interview a single person that had any personal interest

8  in that.  On the contrary, the only person we interviewed who

9  really had anything to say about that was someone who had been

10  primarily a proponent of Dr. Tiwari's.

11        So this was focused exclusively on the facts as they

12  apply to his practice of medicine and his treatment of his

13  patients.

14        There is no question that he has extraordinary

15  skills.  I think if there was a theme the Government would

16  use, to paraphrase one of the letters from one of his former

17  patients, he helped some but he hurt many.

18        It's important to understand that he understood

19  this -- he has acknowledged this repeatedly -- and that he did

20  so after a full disclosure of a huge mound of facts that the

21  Government assembled in investigating this case, freely shared

22  with the defense.  He's represented by extremely able counsel,

23  probably tried more cases in federal court than anybody else

24  in the state of Indiana, certainly never afraid to go to

25  trial, and certainly very capable of understanding the facts

1  of this case.

2          Only after thorough months of exchange of documents

3  and evidence, meetings, and discussions, and full vetting of

4  all those facts did he face the fact that he was guilty of

5  this crime.  And understand, it's always hard, extremely hard

6  for anyone to do it, to make that step, especially someone who

7  has the professional and personal pride that someone like

8  Dr. Tiwari has, but I would note, to rely on an individual for

9  an understanding of the facts, for one or two people for

10 anecdotes, and most especially I can say, having done some

11 complicated cases for 25 years, the media, of all things, is

12 no more than looking through a glass darkly, and that these

13 are complicated matters, that having read lots and lots of

14 media accounts of things I knew a lot about, can be shocked at

15 the lack of clear, true depictions given of the real, true

16 facts of the case.

17         So it's important, I think, for the Court to know,

18 and for Dr. Tiwari's proponents to know, that there is a dark

19 side, a troublesome side to him.  And it doesn't do him any

20 favors for any of his people there to help him to not

21 recognize that, and also to let the Court know that those

22 folks, well meaning certainly they are, and many things they

23 said are entirely appropriate, but they do not speak for the

24 community of Bloomington and the great area.

25         The Government spent months, literally, interviewing

1  dozens of people all over some of the most remote areas of

2  southern Indiana, and there is an enormous amount of troubled

3  people that Dr. Tiwari dealt with, and troubled about the

4  nature of his practice.

5         So that's a context that I think is extremely

6  important for the Court and for the community to understand

7  going into this sentencing.

8         Among the things that the Government looked at and

9  developed in support of its case were most importantly his

10 only employees who were the most important parts of the

11 Government's case, many of them people who had for a long time

12 been sympathetic to him, to some degree many sympathetic even

13 as they were going to testify against him, had no axes to

14 grind against Dr. Tiwari, but had some very damaging facts as

15 some of the letters the Court has seen tell.  And there's no

16 more powerful testimony as a prosecutor than to have that kind

17 of testimony, which is one of the key reasons the Government

18 pursued the case as aggressively as it did.

19        Experts, the Government had two very noted experts

20 who had come to, completely independently of each other, the

21 exact same conclusions, from looking at dozens of patient

22 files, about the nature of Dr. Tiwari's practice, and how it

23 had come completely off the rails in the last year, and were

24 very powerful witnesses.  One, in particular, I would note,

25 made it a point of continuously acknowledging that there's a

1   huge variety of practice in the pain management field, and he

2   was very reluctant to sit in judgment but then would come back

3   to "but, in this circumstance and in what I've seen in these

4   files, I have no choice."

5          And finally, this is an extremely vulnerable patient

6   population.  The Government learned, again in the course of

7   interviewing dozens of people and traveling all over some

8   remote areas of southern Indiana, that the notion of drug

9   seekers -- and I want to dispel this if nothing else -- is

10  really one that's really unfair to many of these people who

11  can get branded that way.  It is a much more nuanced picture

12  that develops.  As you read people who take opioids, who can

13  actively seek opioids, there are numbers, the vast majority of

14  them we found, are people who are clearly in tremendous

15  distress of various kinds, psychological distress, clearly

16  under the impression that they have great chronic pain, a lot

17  of times with objective indicators of pain.

18         But in any case, they clearly believe they are in

19  distress, and opioids provide them some kind of remedy.  And

20  they seek those opioids.  To that degree, they are drug

21  seekers, that is true, but they are a very vulnerable

22  population, in our experience, people with very little means

23  and sophistication to navigate the problems that they have,

24  and makes them all the more dependent on the healthcare system

25  to give them the right treatment.

1          In this case, they didn't.  The last year of

2    Dr. Tiwari's practice, he used these patients as a vehicle to

3    commit fraud.  And in that sense, Your Honor, the 3553

4    factors, I'd acknowledge certainly the defense, as they

5    should, talk about whether incarceration is really going to

6    make a big difference in Dr. Tiwari's life, but I suggest the

7    core of the 3553(a) factors are the nature and circumstances

8    and the seriousness of the offense, respect for the law, and

9    just punishment, which really are themes to keep us all

10   focused on the importance, as much as mercy sometimes wants to

11   enter into our picture, that there are greater societal issues

12   at stake in these sentencings.  And that is certainly in this

13   case and the realm of fraud cases.  The Government typically

14   deals with things that are often referred to as services not

15   rendered, or upcoding where it is essentially a gaming of the

16   system with insurance conditions.  And things are never

17   performed or billed in ways that they are not appropriate.

18          This was the unusual, very unusual case, in my

19   experience, of a medical necessity case, a case which is

20   another prong of the requirement that people when they send

21   claims to insurance companies, that they vouch that the

22   procedure is medically necessary.  And in this case, many of

23   these procedures that Dr. Tiwari was performing are not

24   medically necessary, and he knew they weren't medically

25   necessary.  And as the letters to the Court point out, there

1  were some very distressing consequences of that practice.

2       These were invasive procedures involving very

3  substantial needles, and they had serious consequences for

4  these patients who came to him in good faith and were hurt in

5  the process.

6       Now, the guidelines provided two levels for the risk

7  of causing serious harm.  And that's accounted for in the

8  guidelines, but the Government just points out that in the

9  nature and circumstances and seriousness of the offense, that

10 this is part of the equation, that it does not take this out,

11 by any means, of the guideline.  On the contrary, it puts it

12 squarely within the guideline range.

13      Respect for the law, just punishment, again, the

14 Government points out that these are community issues that

15 it's very important for people to understand are held out by

16 the criminal justice system.  With someone like Dr. Tiwari,

17 who readily admits has enormous gifts, and many of these were

18 given to him by nature, obviously a big brain, and a certain

19 self discipline, delayed -- ability to delay gratification,

20 all the things that come with being a prominent professional

21 in our society, are things that are admirable virtues, but a

22 lot of things that he has to say are things we should expect

23 from those kinds of people as well, not to denigrate them, but

24 he does have a lot of gifts, and he's made the most of them to

25 some degree, but he has some serious, serious flaws.  No

1  professional comes before the courts in any situation remotely

2  like this where there isn't a complex picture presented like

3  that.  And this is certainly one of them.  And there are

4  tremendous flaws that the Government has to point out here

5  with Dr. Tiwari.  And I'd suggest the most important one that

6  comes through, in his own writings and statements to the

7  Court, is a certain hubris of pride that goes beyond what most

8  professionals have or should have, and really is at the core

9  of what drove this, and really underlie the importance and

10  respect of the law and just punishment, that that is what's at

11  root here, and it has to be punished to show respect for the

12  law, that we expect much, much more from our professionals.

13  They are people who much is given and much is expected.

14        I know a large number of professionals, healthcare

15  professionals, who have tremendous stress with our healthcare

16  system, and I understand that completely, but I can say from

17  the other perspective, there's nobody in our society who gets

18  to send in a piece of paper, the vast majority any more

19  electronically, and gets a check.  The fact is more than 95

20  percent of the time when they send in that piece of paper,

21  they get their check with zero scrutiny.  While they see a lot

22  of the anguish that goes on with the other five percent, the

23  fact is it is a system that has tremendous amount of trust in

24  the kinds of procedures and care that patients are given and

25  pays them freely on representations.

1          In this case, that was abused across the board in

2    really the most serious way that it could in a crime of this

3    context, and that falls within these guidelines.

4          I'd say with that, Your Honor, the guideline range

5    is 63 to 78 months.  The Government would ask for something at

6    the higher end of the guideline range for the reasons we

7    state.  We think that the guideline range is entirely

8    appropriate in this case.  Thank you.

9          THE COURT:  Thank you, Mr. Ong.

10          Ms. Ivie, would you come, please.

11               (Off-the-record discussion.)

12          THE COURT:  Mr. Marsh, would you escort Dr. Tiwari

13    back to the podium, please, and Mr. Donahoe.

14          The lawyers have done their usual fine job in

15    capturing the issues that the Court has to address, and also

16    underscoring the difficulty that the Court confronts in

17    fashioning a reasonable sentence.

18          It would be easier frankly to just put it out there,

19    Dr. Tiwari, that if there was some reason to think that you

20    needed to -- you were a sufficiently bad person that you

21    needed to be taken out of society, and society needed to be

22    protected and so forth, but it's clearly not true.

23          It's true in some ways.  Probably if you'd had

24    somebody else supervising you, whom you allowed to supervise

25    you, or to watch, or to be a colleague whose judgment you

36

1   respected, you might have pulled back some when you didn't and

2   you should have.  The fact that you have this huge trust

3   placed in you as a physician where nobody really can supervise

4   you, in that sense, you're making judgments that society has

5   authorized you to make, and empowered you to make, that are

6   almost unilateral.  You have to make the decision as to what

7   care and treatment and protocols are required, and it's not

8   subject to second guessing until you get out on the fringes.

9           And there's a professional reticence by colleagues

10  and so forth to comment on the appropriateness of some other

11  doctor's judgment with respect to the particular care.  It's

12  only when we see the larger pattern and we hear of some of the

13  behaviors that were reported to the Government in the course

14  of their investigation that it's obvious that you were

15  entirely out of bounds.

16          I think, although I'm sort of speculating here, that

17  one of the things that you took pride in and that fueled your

18  high energy lifestyle and practice where you were basically

19  everything to everybody, you were a good member of the

20  community, you were a good father, you were a good husband,

21  you were a dedicated physician, you were a businessman,

22  et cetera.  In all these respects, I mean, you were operating

23  on tiptoes.  And there's an inherent risk of unbalance when

24  you're operating on tiptoes.

25          So part of what drove that sort of manic involvement

1  in the community -- just telling you how it looked to me --

2  was this pride, Mr. Ong's word is probably better, hubris,

3  that you could do it all, that you didn't have limits, you

4  didn't have boundaries, and that it wasn't 30 patients a day.

5  It was 80 or 90 patients a day.  It was like a mill to treat

6  90 patients in a day, or 75 patients, or whatever.  I'm only

7  basing it on what people told me.  I wasn't there.  I didn't

8  review the records, but it was some unbelievable number of

9  people.

10         You would have to think yourself superhuman to churn

11  through that amount of business on a regular basis.  That

12  sounds like pride.  That sounds like hubris.  So the people

13  who had the overview, your employees and so forth, were seeing

14  that it was destined to bring about problems.  And the really

15  sad fact is that the problems, prior to your being prosecuted,

16  were all borne by your patients who basically were given short

17  shrift when you were so busy, or when they weren't responding

18  to treatments, or they were creating care dilemmas for you,

19  that you would sort of pull ahead and do what you were going

20  to do.

21         So it's interesting to my analysis, helpful to my

22  analysis, I should say, that there are two kinds of offenses

23  here that you have been found guilty of.  The first one, of

24  course, is this fraud on the system by which you obtained

25  $1.3 million.  That's the calculation.  So I assume since it's

1  stipulated to, that you agree that it was that amount.  I

2  suppose it could have been more, but at least everybody agrees

3  1.3 million, that that was money that you milked out of the

4  system based on the way you were practicing with unnecessary

5  procedures being performed as measured by the medical

6  necessity.

7          So it is true that the system is also built on

8  trust.  Your patients expected the trust, and the United

9  States government expected your trust in managing this system,

10  and getting the benefits that you're entitled to, but no more

11  than that.  And there's a lot of grousing that goes along in

12  our society about how the reimbursements are inadequate for

13  most physicians.

14          I can't evaluate that.  That's just what I hear.

15  But to the extent that they're inadequate, we have to say that

16  maybe one of the reasons is because some people defraud the

17  system and take more than they are entitled to.  That would be

18  you.  That's what you pled guilty to doing.  You took these

19  monies that could have been used for other physical physicians

20  and other patients and took more than your share.

21          The other offense that you've pled guilty to is an

22  illegal drug distribution, which means you weren't operating

23  within ranges of acceptable medical care.  You illegally

24  distributed drugs.  So of course there are ways in which

25  you're not like a street dealer distributing drugs.  But in

1  terms of the bottom line behavior, it was the same offense.

2       So these are hugely serious and deserving of

3  punishment, but it would be wrong to let the sentence only

4  reflect that because the truth is you've done noble things,

5  you've done important things, significant things in virtually

6  every other respect.

7       So the Court's directed to take into account the

8  nature and circumstances of the offense, but also your history

9  and characteristics.  And it's a hard balance to make because

10 if we had not known anything about this, prior to this

11 prosecution, everybody but the Government who is working on

12 the investigation, would have thought "Well, okay, if those

13 factors are applied to Dr. Tiwari, the history and

14 characteristics come out A plus," because there's violations,

15 it's just good deeds, and the nature and circumstances of your

16 career, not the offense at that point, A plus and so forth.

17      So I spin this out because I want you to see that

18 I'm trying to factor into my decision all of these factors as

19 I must, and how hard it is to strike a balance.  I have no

20 pretense that I'm going to be able to craft a sentence here

21 that's perfect.

22      Judging is a lot like medicine.  We do the best we

23 can.  So it seems to me that the 78 month cap, which reflects

24 the high end of the guidelines would not properly take into

25 account the many good things you did.  So I'm prepared to pull

1  back from that for purposes of imposing a period of

2  incarceration to properly reflect the fact that you have made

3  really these significant contributions.

4  Probation?  No.  That wouldn't take into account the

5  seriousness of the offense.  So I'm going to impose the

6  sentence at 42 months.  And 42 months is my best effort to

7  have the sentence deter others who might be tempted to engage

8  in these kinds of Medicare/Medicaid frauds, to move past the

9  boundaries of legitimate medical care into illegal drug

10  distribution, to punish you for the offenses that you've

11  committed by causing others to suffer, causing the enormous

12  expenditure of resources by the Government in order to track

13  down and document the fraud.

14  So I'm trying to deter others while I deter you,

15  although I think it doesn't take much to deter you.  You've

16  gotten the message surely by this point.

17  That sentence also takes into account the

18  punishments that have already been meted out that are sort of

19  indirect, the fact that you've lost your license, that in the

20  community you've lost face, you've lost standing, and so

21  forth.  You've lost your considerable financial wherewithal

22  awaiting this day.

23  So that will be the period of incarceration, 42

24  months, for the reasons stated.  I think that reflects the

25  seriousness of the offense and promotes respect for the law

1   and represents just punishment.

2          I'm going to impose -- that would be a 42-month

3   sentence on each count to run concurrently.  The period of

4   supervised release will be three years on each count to run

5   concurrently.  Three years is consistent with the parties'

6   11(c)(1)(c) agreement.  It will give you, Dr. Tiwari, an

7   opportunity to make regular payments in a monitored way on the

8   restitution, which will be part of the terms of your

9   supervised release, and it will also permit you to basically

10  get back on your feet and find these productive, constructive

11  ways to reenter society, to hopefully do work that's good.

12         So here are the terms and conditions for the period

13  of supervised release.  You must not commit any other federal,

14  state or local crime while you're on supervised release.  You

15  must not possess any firearms, ammunition, destructive device

16  or any other dangerous weapon.  You must cooperate with the

17  collection of a DNA sample.  And you must refrain from all

18  unlawful uses of controlled substance.

19         I'll suspend you from drug testing personally that

20  would otherwise be mandated by the Crime Control Act of 1994

21  because you pose no apparent risk of future substance abuse.

22         It is a condition of supervised release that you pay

23  any amount of restitution that the Court imposes here that

24  remains unpaid at the commencement of the term of supervised

25  release.  You must provide the probation officer access to any

42

1   requested financial information.  And you may not incur any

2   new credit charges or open additional lines of credit without

3   the prior approval of the probation officer.

4          I'll not impose a fine given the amount of the

5   restitution that's required, but the restitution element of

6   the sentence is imposed in the amount of $1,299,886.54, along

7   with the special assessment of $200 that's payable to the

8   Clerk.

9          The restitution is to be made in these amounts to

10   the following victims:  The Centers for Medicare and Medicaid

11   Services, $967,510.63, the Indiana Medicaid program,

12   $154,361.61, and Anthem Blue Cross Blue Shield, $178,014.30.

13          I'm not going to impose, as an element of supervised

14   release, your participation in some sort of community benefit

15   or community service program.  I think you'll probably find

16   your way back to that in any event because I think that's how

17   you're wired.  I think that that is important to you, and I

18   hope you'll return to that because of your love of doing it

19   and your desire to accomplish good things.  And that this

20   time, you'll do it on the basis of your own resources, your

21   own commitment, and not in a way that was fueled by the

22   ill-gotten gains of this particular offense, or from the sort

23   of hyper-practice that you were maintaining as a physician.

24          So that's the sentence I intend to impose and that's

25   my analysis under 3553(a), and given your plea agreement,

1  under Rule 11(c)(1)(c).

2          Mr. Marsh, do you have any legal objection to the

3  Court's sentence or do you request any further elaboration of

4  my reasons?

5          MR. MARSH:  No, Your Honor.

6          THE COURT:  How about you, Mr. Ong?

7          MR. ONG:  No, Your Honor.

8          THE COURT:  The sentence then, Dr. Tiwari, that I've

9  outlined today is now officially imposed, and a Judgment and

10 Commitment Order will be drawn up to reflect these elements as

11 I've laid them out here, and they'll bind you in these ways

12 until the judgment's fully satisfied.

13         Mr. Marsh, I'm prepared to recommend that Dr. Tiwari

14 serve the period of incarceration at the Terre Haute Farm Camp

15 if that is agreeable to you.  It's a minimum security facility

16 and it's close to home.

17         MR. MARSH:  That would be our request, Judge.  Thank

18 you.

19         THE COURT:  The Court is further inclined to allow

20 the defendant to self surrender.  Was there any problem with

21 his being out on release, Ms. Ivie?

22         MR. ONG:  No, Your Honor.

23         PROBATION OFFICER:  There was not, Your Honor.

24         THE COURT:  And that's your view, too, Mr. Ong?

25         MR. ONG:  Yes, Your Honor.

1          THE COURT:  So I assume you would like that to

2    happen as well, Mr. Marsh?

3          MR. MARSH:  Yes, Judge.

4          THE COURT:  So you'll continue on the restrictions

5    and the terms of your release that have brought you to today

6    as if they were today reinforced and restated.  They don't

7    need to be.  We'll just continue in the same fashion.

8          When the Bureau of Prisons makes its decision as to

9    where you'll serve the period of incarceration, hopefully your

10   family will be able to get you to that place.  If not, you

11   need to turn yourself in to the marshal here in this building.

12   I recommend that you get your family to take you because it's

13   just an easier trip than going by the marshal's van.  And

14   you'll want to have them nearby you as long as you can.  I

15   know that's true.

16         So good luck, Dr. Tiwari.

17         THE DEFENDANT:  Thank you.

18         THE COURT:  Thank you, Counsel.

19         MR. MARSH:  Thank you, Your Honor.

20         THE COURT:  Ms. Ivie?

21         PROBATION OFFICER:  Will the Court order forfeiture

22   or will that come --

23         THE COURT:  Is there a forfeiture in the indictment?

24         MR. ONG:  Yes, yes, there is actually.

25         THE COURT:  Is there any objection to the

1    forfeiture?

2            MR. MARSH:  No, Your Honor.

3            THE COURT:  Then the Court hereby also orders the

4    forfeiture consistent with the plea agreement and with the

5    allegations in the indictment.

6            Thank you.

7            Mr. Ong, you should follow up with your motion to

8    dismiss.

9            MR. ONG:  Yes, Your Honor.

10           THE COURT:  Thank you again, Counsel.

11

12                (Court adjourned at 11:50 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


I, Laura Howie-Walters, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.


/S/LAURA HOWIE-WALTERS   October 23rd, 2012

LAURA HOWIE-WALTERS, FCRR/RPR/CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division